UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WATERFALL EDEN MASTER FUND, LTD,    :

     Plaintiff,    :

vs.    :

HSBC BANK USA, National Association,    :
HSBC SECURITIES (USA) INC., HSI
ASSET SECURITIZATION CORPORATION    :
and HASCO NIM (CAYMAN) COMPANY
2006-FF9,    :

     Defendants.    :

**'09 CIV 4983**

Civil Action No. _____

COMPLAINT FOR VIOLATION OF
§§ 12 (a)(2) AND 15 OF THE
SECURITIES ACT OF 1933

**DEMAND FOR JURY TRIAL**

**COMPLAINT**

Plaintiff, WATERFALL EDEN MASTER FUND, LTD. ("WATERFALL EDEN") sues

Defendants HSBC BANK USA, National Association ("HSBC BANK"), HSBC SECURITIES

(USA) INC. ("HSBC SECURITIES"), HSI ASSET SECURITIZATION CORPORATION

("HSI"), and HASCO NIM (CAYMAN) COMPANY 2006-FF9 ("HASCO NIM COMPANY"),

and alleges as follows:

    1.      This is an action involving WATERFALL EDEN's purchase and ownership of

net interest margin notes[1] issued by HASCO NIM COMPANY. The net interest margin notes

were collateralized by securities certificates which were in turn collateralized by a pool of

individual sub-prime mortgage loans on residential real estate purchased by HSBC BANK.

HSBC SECURITIES sold the net interest margin notes to WATERFALL EDEN pursuant to

false and misleading offering documents. By this action, WATERFALL EDEN seeks redress

---

[1] Net interest margin notes ("NIMS") are a type of security that allows holders to access excess cash flows resulting
from securitized mortgage loan pools. Excess cash flows from the securitized mortgage loan pools are transferred to
a trust account through a NIMS transaction. From this trust account, investors of the NIMS receive interest and
principal payments.

against the Defendants pursuant to Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE ALLEGATIONS

2.    The claims asserted herein arise under and pursuant to Sections 12 (a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77K, 77l (a)(2) and 77o.

3.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. §§ 1331 and 1337.

4.    Venue is proper in this District pursuant to Section 22 of the Securities Act and to 28 U.S.C. § 1391. Upon information and belief substantial and material events and omissions giving rise to this action, including certain transactions, acts, practices and course of business, took place in the Southern District of New York.

5.    In connection with the acts alleged herein, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

6.    WATERFALL EDEN is a limited liability investment company organized and existing under and by virtue of the laws of the Cayman Islands, with its principal place of business at 1185 Avenue of the Americas, 18th Floor, New York, NY 10036.

7.    HSBC BANK is a national banking association with its principal place of business at 452 Fifth Avenue, New York, NY 10018. HSBC is an affiliate of HSBC SECURITIES, HSI and HASCO NIM COMPANY. HSBC served as sponsor of the securities certificates and seller of the mortgage loans which served as collateral for the securities certificates.

8.    HSBC SECURITIES is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, NY 10018. HSBC SECURITIES is, and was at all relevant times, a securities broker/dealer licensed to do business in the State of New York and is registered with the United States Securities and Exchange Commission ("SEC"), the State of New York and the Financial Industry Regulatory Authority ("FINRA"). HSBC SECURITIES is subject to the laws of the United States and the State of New York, and the rules and regulations promulgated thereunder by the SEC and subject to the rules and regulations of the self-regulating organizations of which it is a member, in addition to being subject to its own internal rules and regulations. HSBC SECURITIES is an affiliate of HSBC BANK, HSI, and HASCO NIM COMPANY. HSBC SECURITIES acted as the lead underwriter of the securities certificates and Class A Notes that are the subject of this action and sold those certificates and Class A Notes to investors and other broker-dealers. As the lead underwriter, HSBC SECURITIES was responsible for the drafting and dissemination of the Offering Memorandum and Prospectus Supplement pursuant to which Class A Notes were sold to WATERFALL EDEN by HSBC SECURITIES.

9.    HSI is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, NY 10018. HSI is an affiliate of HSBC BANK, HSBC SECURITIES and HASCO NIM COMPANY. HSI is a special purpose corporation. HSI, as Depositor, acquired from HSBC BANK the mortgage loans which served as collateral for the securities certificates described herein and assigned the mortgage loans to a trust for the benefit of the holders of the securities certificates.

10.    HASCO NIM COMPANY is a special purpose company incorporated on July 10, 2006 under the laws of the Cayman Islands and has no significant assets. HASCO NIM

COMPANY is an affiliate of HSBC BANK, HSBC SECURITIES and HSI. HASCO NIM COMPANY was the issuer of the Class A Notes.

11.    WATERFALL EDEN voluntarily opts out of any and all class actions that have been filed or may be filed against the Defendants prior to the final resolution of the case.

### FACTUAL BACKGROUND

12.    On or about July 6, 2006, First Franklin Mortgage Loan Trust 2006 – FF9 ("FFMLT 2006–FF9" or the "FFMLT Trust") issued a series of Mortgage Pass-Through Certificates (the "Certificates") titled Series 2006–FF9 (the "Transaction"). FFMLT 2006–FF9 is a common law trust created pursuant to a pooling and servicing agreement dated as of June 1, 2006.

13.    The Transaction was collateralized by a pool of sub-prime residential real estate mortgage loans (the "mortgage loans").[2]  HSBC BANK, with the assistance of HSBC SECURITIES, purchased the mortgage loans from First Franklin Financial Corporation ("First Franklin Financial").  HSBC BANK sold the mortgage loans to HSI, which deposited the mortgage loans in FFMLT 2006-FF9.  The FFMLT Trust securitized the mortgage loans and then issued the Certificates to HSI.  HSBC SECURITIES then purchased all of the Certificates from HSI.  The Certificates are what is commonly known in the industry as structured "Asset Backed Securities."[3]

---

[2] The collateral for FFMLT 2006-FF9 consisted of a mortgage pool of 9,319 fixed rate, adjustable rate, interest only, fully amortizing and balloon residential mortgage loans (the "mortgage loans") with an aggregate principal balance of $1,720,538,691.

[3] On January 18, 2005, the SEC approved the following definition of Asset-Backed Securities:

> The term "asset-backed security" is currently defined in Form S-3 to mean a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets either fixed or revolving that by their terms convert into cash within a finite time period plus any rights or assets designed to assure the securing or timely distribution of proceeds to the security holders.

14.    HSBC SECURITIES purchased the Certificates from HSI on or after July 6, 2006, in order to sell individual pieces (aka "tranches") of the Certificates to purchasers on the open market, including investors and other broker-dealers. HSBC held the Class P and Class X Certificates for the purpose of entering into a NIMS transaction.

15.    Amongst other actions, in order to facilitate the sale of the Certificates and Class A Notes on the open market, the Defendants:

a.    Published an April 3, 2006 Prospectus which set forth the general conditions for the sale of non-specific asset-backed pass-through certificates;

b.    Published a July 6, 2006 Prospectus Supplement for the Transaction regarding the sale of the Certificates and creation of the net interest margin notes; and

c.    Published a July 20, 2006 Offering Memorandum for the sale of the Class A Notes.

16.    The Prospectus and the Prospectus Supplement were prepared and issued with the input, advice and consent of Defendants HSBC BANK, HSBC SECURITIES and HSI. The Offering Memorandum for the sale of the Class A Notes was prepared and issued with the input, advice and consent of Defendants HSBC BANK, HSBC SECURITIES, HSI and HASCO NIM COMPANY. The Prospectus and Prospectus Supplement were incorporated by reference and included as exhibits to the Offering Memorandum.

17.    On or about July 20, 2006, HASCO NIM COMPANY issued a series of net interest margin notes titled "Hasco Net Interest Margin Notes, Series 2006-FF9" (the "NIMS Transaction"). The NIMS Transaction consisted of the 6.750% Class A Notes in the aggregate

principal amount of $38,350,000 (the "Class A Notes") and the 8.000% Class B Notes in the

aggregate principal amount of $6,350,000 (the "Class B Notes" and, together with the Class A

Notes, the "Notes"). The Notes were issued pursuant to an indenture dated as of July 21, 2006

(the "Indenture") between HASCO NIM COMPANY as issuer and Wells Fargo Bank, N.A., in

its capacity as indenture trustee. The Notes were secured primarily by mortgage pass-through

certificates representing a 100% percentage interest in each of the First Franklin Mortgage Loan

Trust 2006-FF9, Mortgage Pass-Through Certificates, Series 2006-FF9 ("FFMLT 2006-FF9"),

Class X (the "Class X Certificates") and Class P (the "Class P Certificates" and together with the

Class X Certificates, the "Underlying Securities")[4]. The Class X Certificate represented the right

to certain excess interest payments and any excess overcollateralization in the initial amount of

$18,531,854 from the Certificates. The Class P Certificates were entitled to all prepayment

premiums received in respect of the mortgage loans.

18.    In the instant case "NIMS Transaction" means the placement of the Class P and

Class X Certificates into a separate trust which will issue NIM Securities backed by all or a

portion of such certificates. From this trust account, investors of the NIMS receive principal and

interest payments.

---

[4] The Underlying Securities were issued pursuant to a pooling and servicing agreement dated as of June 1, 2006 (the "Pooling and Servicing Agreement"), among HSI, as depositor, Deutsche Bank National Trust Company, as trustee (the "Underlying Trustee"), Wells Fargo Bank, N.A., as master servicer (in such capacity, the "Underlying Master Servicer"), First Franklin Financial Corporation, as mortgage loan seller (the "Underlying Mortgage Loan Seller"), and National City Home Loan Services, Inc., as servicer (the "Underlying Servicer").

The Underlying Securities were sold by HSBC SECURITIES to HSI as Depositor and, in turn, by HSI to HASCO NIM COMPANY on the date of the initial issuance of the Notes in exchange for the Notes. The Underlying Securities described herein served as the collateral for the Notes.

19.     NIMS are derivative securities[5] of securitized residential mortgage loan pools. The primary source of payments to NIMS comes from the difference between the interest payments collected from the mortgage loans and the interest owed to the securities, together with prepayment penalties received from the mortgage loans.

20.     WATERFALL EDEN purchased the Class A Notes from HSBC SECURITIES in two separate purchases:

> a.     $10,000,000 original face amount on January 12, 2007 at a price of 99.25% ($6,306,866.74). The current face of the Security on the purchase date was $6,355,000.

> b.     $5,675,000 original face amount on May 4, 2007 at a price of 96.12% ($2,588,505.91). The current face of the Security on the purchase date was $2,692,787.

21.     The total purchase price paid by WATERFALL EDEN for the Class A Notes was $8,895,371.74.

22.     On the dates WATERFALL EDEN purchased the Class A Notes, the Class A Notes were rated BBB (investment grade rating) by Fitch, Inc. ("Fitch"). On May 29, 2008, Fitch downgraded the rating of the Class A Notes to C.[6]

23.     The Class A Notes owned by WATERFALL EDEN have no value. The current unpaid principal balance of the Class A Notes owned by WATERFALL EDEN is $5,478,945. Delinquent interest due on the Class A Notes is the sum of $266,643 as of April 27, 2009.

---

[5] A derivative security is a financial security whose value is derived in part from the value and characteristics of another security, the underlying asset.
[6] Fitch's C rating classification of a structured security is defined as "Exceptionally high levels of credit risk — Default appears imminent or inevitable."

24.    In the Prospectus Supplement, HSI was identified as the Depositor for FFMLT 2006-FF9's Certificate offerings. While HSI served as the Depositor for the FFMLT Trust, HSI was directed and controlled by HSBC BANK and HSBC SECURITIES.

25.    The Prospectus Supplement identified HSBC BANK as the "Sponsor" of the Transaction and "Seller" of the mortgage loans acquired by the Depositor, HSI.

26.    According to the Prospectus Supplement, HSI acquired a pool of mortgage loans from HSBC BANK, which purchased the mortgage loans or otherwise acquired them through a bulk purchase from First Franklin Financial. The pool of loans was then sold to HSI and passed-through to the FFMLT Trust.

27.    HSI, the Depositor, then worked with HSBC BANK and HSBC SECURITIES to structure the securitization transactions and price the Certificates.

28.    The Offering Documents contained material statements regarding (i) the underwriting process and standards by which the mortgage loans held by the FFMLT Trust were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by First Franklin Financial when evaluating and acquiring the loans; (iii) representations concerning the value of the underlying real-estate securing the loans pooled in the respective Issuing Trusts, in terms of loans to value ("LTV") averages and the appraisal standards by which such real estate values were measured; and (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors, including WATERFALL EDEN.

29.    The Prospectus Supplement included tables with data concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans,

the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties.

30.    The Prospectus Supplement stated that First Franklin Financial acquired 99% of the mortgage loans underlying the Certificates from First Franklin ("FF") a division of National City Bank of Indiana and an affiliate of First Franklin Financial. The Prospectus Supplement stated that substantially all of the mortgage loans were acquired by First Franklin Financial based on loan applications submitted to FF by third party mortgage brokers which do not fund the mortgage loans.

31.    The Prospectus Supplement represented that the mortgage loans underlying the Certificates including Certificates X and P "were required to meet the underwriting criteria described in this Prospectus Supplement."

32.    As represented in the Prospectus Supplement, First Franklin Financial's underwriting and acquisition underwriting standards were primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. As represented, First Franklin Financial did, and third-party originators were required to, conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the asset quality procedure, each originator was supposed to review a random selection of each month's originations.

33.    Regarding acquired loans, the Prospectus Supplement represented that the standards adopted by First Franklin Financial required that the mortgage loans of a type similar to the mortgage loans were underwritten by third party originators with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with First Franklin

Financial's guidelines for acquisition, the third party originators must have considered, among other things, the mortgagor's credit history, repayment ability, and debt service to income ratio, as well as the type and use of the mortgaged property. In addition, the Prospectus Supplement represented that each of the loan originators must have met minimum standards set by First Franklin Financial, based on certain acquisition guidelines, in order to submit loan packages, and that those loans must have been in compliance with the terms of a signed mortgage loan purchase agreement.

34.      The Prospectus Supplement represented that third party originators of loans acquired by First Franklin Financial were originated in accordance with First Franklin Financial's underwriting program called the Direct Access Program, which relied upon a borrower's credit score to determine a borrower's likely future credit performance. First Franklin Financial's acquisition guidelines required that the third party originator approve the Mortgage Loan using the Direct Access Program risk-based pricing matrix.

35.      The Prospectus Supplement described the Direct Access Program as follows:

> Within the Direct Access Program, there are four documentation programs, the Full Documentation Program, the Limited Income Verification Program (the "LIV"), the Stated Plus Program and the No Income Verification Program (the "NIV"). In addition, under the responsible party's Blended Access Program, in the case of loans with two or more borrowers, if one of those borrowers with more than 50% of the total qualifying income is underwritten under a full documentation program, then the other borrower or borrowers may be underwritten under a stated documentation program. All of the Mortgage Loans were acquired by the Mortgage Loan Seller under the Direct Access Program. While each underwriting program is intended to assess the risk of default, the Direct Access Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score"). The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("Fair, Isaac") and the three national credit repositories Equifax, Trans Union and First American (formerly Experian which was formerly TRW). The

Credit Bureau Risk Scores available from the three national credit repositories are calculated by the assignment of weightings to the most predictive data collected by the credit repositories and range from 300 to 850. Although the Credit Bureau Risk Scores are based solely on the information at the particular credit repository, such Credit Bureau Risk Scores have been calibrated to indicate the same level of credit risk regardless of which credit repository is used. The Credit Bureau Risk Score is used as an aid to, not a substitute for, the underwriter's judgment.

The Direct Access Program was developed to simplify the origination process for third party originators. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, Direct Access relies upon a borrower's Credit Bureau Risk Score initially to determine a borrower's likely future credit performance. Third party originators are able to access Credit Bureau Risk Scores at the initial phases of the loan application process and use the score to determine a borrower's interest rate. The Mortgage Loan Seller's acquisition guidelines require that the third party originator approve the Mortgage Loan using the Direct Access Program risk-based pricing matrix.

In accordance with the Mortgage Loan Seller's guidelines for acquisition, under the Direct Access Program, the third party originators must require that the Credit Bureau Risk Score of the primary borrower (the borrower with at least 51.00% of total income for all LIVs) be used to determine program eligibility. Credit Bureau Risk Scores must be obtained from at least two national credit repositories; with the lower of the two scores being utilized in program eligibility determination. If Credit Bureau Risk Scores are obtained from three credit repositories, the middle of the three scores can be utilized. In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Bureau Risk Score or the borrower is not eligible for the Direct Access Program. Generally, the minimum Credit Bureau Risk Score allowed under the Direct Access Program is 540.

The Credit Bureau Risk Score, along with the loan-to-value ratio, is an important tool in assessing the creditworthiness of a Direct Access borrower. However, these two factors are not the only considerations in underwriting a Direct Access loan. The third party originators are required to review each Direct Access loan to determine whether the Mortgage Loan Seller's guidelines for income, assets, employment and collateral are met.

In accordance with the Mortgage Loan Seller's guidelines for acquisition, all of the mortgage loans of a type similar to the Mortgage Loans were required to be underwritten by the third party originator's underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, a third party originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

In accordance with the Mortgage Loan Seller's guidelines for acquisition, the third party originators' underwriters are required to verify the income of each applicant under various documentation programs as follows: under the Full Documentation Program, applicants are generally required to submit verification of stable income for the periods of six months to two years preceding the application dependent on credit score range; under the LIV Program, the borrower is qualified based on the income stated on the application and applicants are generally required to submit verification of adequate cash flow to meet credit obligations for the six month period preceding the application; the Stated Plus Program allows income to be stated, but requires borrowers to provide verification of liquid assets equaling three months of income stated on the mortgage application; under the NIV Program, applicants are qualified based on monthly income as stated on the mortgage application and the underwriter will determine that the stated income is reasonable and realistic when compared to borrower's employment type, assets and credit history. For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with a credit score greater than or equal to 540 and not originated in conjunction with a second lien mortgage, bank statements (for 12 months) are acceptable as full documentation. For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with credit scores greater than or equal to 600, regardless of being originated with a corresponding second lien mortgage, twelve months of bank statements are acceptable as full documentation. In all cases, the income stated must be reasonable and customary for the applicant's line of work. Although the income is not verified under the LIV and NIV Programs, a preclosing audit should be conducted to confirm that

the business exists. Verification may be made through phone contact to the place of business, obtaining a valid business license, CPA/Enrolled Agent letter or through Dunn and Bradstreet Information Services.

The applicant generally must have a sufficiently established credit history to qualify for the appropriate Credit Bureau Risk Score range under the Direct Access Program. This credit history is substantiated by a two repository merged report prepared by an independent credit report agency. The report typically summarizes the applicant's entire credit history, and generally includes a seven year public record search for each address where the applicant has lived during the two years prior to the issuance of the credit report and contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In some instances, borrowers with a minimal credit history are eligible for financing under the Direct Access Program.

The third party originators originate loans secured by one-to-four-unit residential properties made to eligible borrowers with a vested fee simple (or in some cases a leasehold) interest in the property. In accordance with the Mortgage Loan Seller's guidelines for acquisition, the third party originators are required to comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by the Mortgage Loan Seller. Review appraisals may only be provided by appraisers approved by the Mortgage Loan Seller. In some cases, the third party originator may rely on a statistical appraisal methodology provided by a third party.

Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the third party originators. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises. The review appraisal may be waived by a Standard Plus Delegated Underwriter.

The third party originators are required to conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the compliance audit, all loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations must be reviewed by each third party originator. The loan review is required to confirm the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings and branch responses must then be reviewed by the third party originator's senior management. Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows the third party originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio. In general, higher credit risk mortgage loans are graded in categories which permit higher Debt Ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however these loan programs establish lower maximum loan-to-value ratios and lower maximum loan amounts for loans graded in such categories.

The third party originators' origination guidelines under the Direct Access Program generally have the following criteria for borrower eligibility for the specified Credit Bureau Risk Score range:

The Debt Ratio generally may not exceed 50.49% for all credit scores on full documentation and LIV loans. Loans meeting the residual income requirements may have a maximum Debt Ratio of 55.49%. The Debt Ratio for NIV loans may not exceed 50.49%.

36.    The above statements, as set forth in paragraph 35 above were materially false and misleading when made because they failed to disclose that First Franklin Financial, FF and the other third party loan originators:   (i)   systematically ignored or abandoned traditional underwriting standards and that the underwriting standards actually utilized failed to conform to First Franklin Financial's acquisition underwriting standards;   (ii) abandoned their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan origination quantity and the resulting fees obtained;   (iii) that the underwriting standards actually utilized did not properly evaluate the borrower's credit standing and ability to repay the loan, as represented;   (iv) exceptions were made to the underwriting standards despite the absence of true compensating factors; and  (iv) that the appraisals were not conducted in accordance with First Franklin Financial's and the other third party loan originators' stated underwriting standards.

37.    The Prospectus Supplement indicated that 30.35% of the mortgage loans underlying the Certificates were issued pursuant to reduced or alternative documentation programs offering varying types of loan products, such as balloon payment or alternative rate mortgage loans. These reduced documentation loans are the classic "liars' loans."

38.    The Prospectus Supplement stated that the mortgage loans underlying the Certificates of  FFMLT 2006-FF9 were originated or acquired from third parties by First Franklin Financial as the Mortgage Loan Seller and stated:

> Since January 1, 2005, all of the mortgage loans of a type similar to Mortgage Loans that were acquired by the Mortgage Loan Seller were required to meet the underwriting criteria described in this prospectus supplement.
>
> The Mortgage Loan Seller's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The standards established by the Mortgage Loan Seller

require that the mortgage loans of a type similar to the Mortgage Loans were underwritten by the third party originators with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with the Mortgage Loan Seller's guidelines for acquisition, the third party originators must consider, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

Substantially all of the mortgage loans of a similar type as the Mortgage Loans were acquired by the Mortgage Loan Seller based on loan application packages submitted to the third party originators by third party mortgage brokers which do not fund the mortgage loans. These mortgage brokers must meet minimum standards set by the third party originators and, once approved by the third party originators, the mortgage brokers are eligible to submit loan application packages in compliance with the terms of the mortgage broker agreement with the third party originator.

The third party originators must meet minimum standards set by the Mortgage Loan Seller, based on acquisition guidelines that require an analysis of the following information submitted with an application for approval: any applicable state lending license (in good standing), satisfactory credit report only if no federal income tax identification number, signed broker agreement, signed W-9 and signed broker authorization. Once approved as a third party originator, these companies are eligible to submit loan packages for purchase by the Mortgage Loan Seller in compliance with the terms of a signed mortgage loan purchase agreement.

39.    The above statements contained in the Prospectus Supplement as set forth in paragraph 38 above were materially false and misleading when made because they failed to disclose that First Franklin Financial and the other third party loan originators; (i) systematically ignored or abandoned their stated and traditional underwriting standards and that the underwriting standards actually utilized failed to conform to First Franklin Financial's acquisition underwriting standards; and (ii) abandoned their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan origination quantity and the resulting fees obtained.

40.    The Prospectus Supplement included tabular data reflecting the "Distribution by Original Combined Loan-to-Loan Value Ratios" (Exhibit "A") indicating the number of

mortgage loans per each range of Loan-to-Value Ratios, and the weighted average Combined Loan-to-Value Ratio for the mortgage loans. The Prospectus Supplement (per Exhibit "A") indicated that 5,633 mortgage loans (58.70%) (out of 9,319 total loans) were within the Loan-to-Value Ratio range or 95.01% to 100%. The weighted average combined Loan-to-Value ratio for these mortgage loans was represented as 99.96%. Only 16 mortgage loans (0.17%) of the total loan count were represented to have a Loan-to-Value Ratio of greater than 100%.

41.    The tabular statistics (Exhibit "A") in the Prospectus Supplement regarding the purported combined Loan-to-Value Ratios of the underlying mortgages, were materially false and misleading when made because they failed to disclose that the combined Loan-to-Value Ratios would have been higher if the underlying properties were appraised according to pre-established, independent appraisal procedures as stated in the Prospectus Supplements. In addition, the tabular statistics (Exhibit "A") were materially false and misleading when made because the actual Loan-to-Value Ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised according to pre-established independent appraisal procedures per the appraisal guidelines set forth in the Prospectus Supplement.

42.    The Prospectus Supplement represented that FFMLT Trust was structured to include credit enhancement in the form of excess interest and overcollateralization in the amount of $18,531,854. The Prospectus Supplement stated:

Excess Interest.    Excess interest is expected to be generated because the amount of interest collected on the mortgage loans for each due period is expected to be higher than the interest distributable on the certificates and certain fees and expenses payable by the trust for the related distribution date, including any payments owed to the derivative counterparty under the derivative agreements. A portion of this excess interest will be applied both to absorb interest shortfalls and to maintain the required level of overcollateralization.

Overcollateralization. On the closing date, the total principal balance of the mortgage loans is expected to exceed the aggregate class certificate balance of the offered certificates and the Class M-10 certificates by approximately 1.10% of the total scheduled principal balance of the mortgage loans as of the cut-off date, which is approximately $18,531,854. We call this condition "overcollateralization."

43.    The above statements were materially false and misleading when made because they failed to disclose that because First Franklin Financial and the other loan originators systematically ignored or abandoned their underwriting standards, and abandoned their property appraisal standards, borrowers would not be able to repay their mortgage loans, foreclosure sales would not recoup the full value of the mortgage loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplement.

44.    The Offering Memorandum for the Class A Notes contained the following statement:

Ratings. It is a condition of the Notes that the Class A Notes are rated "BBB" by Fitch and the Class B Notes are rated "BB+" by Fitch.

45.    The above statement as set forth in paragraph 44 above was false and misleading when made because the statement (i) failed to disclose that the rating assigned to the Class A Notes did not reflect the likelihood that many of the payments would not be received on the mortgage loans; (ii) misrepresented that the rating considered the actual credit quality of the loans; (iii) misrepresented that the rating considered the extent to which the payment stream on the mortgage loans was adequate to make the payments required by the Class A Notes; and (iv) misrepresented that the Class A Notes were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Underwriters' pre-established rating guidelines.

46.     The Offering Memorandum stated that "the Class A Notes are expected to be retired on the payment date in February, 2008."     This meant that the Class A Notes were structured to have an average life of 20 months from the July 25, 2006 first payment date at which time the Class A Notes owned by WATERFALL EDEN would be paid in full.  The 20 month average life of the Class A Notes was based on Defendants' modeling assumptions which assumed 100% of the prepayment assumption and 100% of the default assumption as set forth in the table prepared by the Defendants attached hereto as Exhibit "B".

47.     The above statement as set forth in paragraph 46 above regarding the expected final payment date in February, 2008 was materially false and misleading when made because the statement failed to disclose that the final payment date in February, 2008 did not reflect the true likelihood of the receipt of all payments on the mortgage loans since the payment stream from the mortgage loans was inadequate and insufficient to make the payments required to retire the Class A Notes by the February, 2008 date or at any other future date beyond February 2008.

48.     As is evidenced by the attached Delinquency Status Report (Exhibit "C") included in the April 27, 2009 HASCO NIM Trust Trustees' Report, the underlying mortgage loans are severely delinquent.  Delinquencies total 40.13% (1,987 loans) of the total remaining loan count of 4,951 loans and 45.94% ($349,433,138) of the remaining unpaid principal balance of $870,752,899.

## FIRST CAUSE OF ACTION

### For Violation of Section 12 (a)(2) of the Securities Act

49.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

50.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of plaintiff, against the Defendants.   This Cause of Action is predicated upon Defendants' strict liability for making false and misleading statements in the Offering Documents.

51.    The Offering Memorandum, Prospectus Supplement and other offering documents for the Class A Notes offering were materially inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

52.    The Defendants are strictly liable to Plaintiff for making the misstatements and omissions in issuing the Class A Notes.

53.    Defendant HSBC SECURITIES acted as the underwriter in the sale of the Class A Notes issued by HASCO NIM COMPANY, directly participated in the distribution of the Class A Notes to the Plaintiff, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Class A Notes.

54.    The Defendants owed to the Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

55.    The Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

56.    Each of the Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

57.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff.

58.    Plaintiff acquired the Class A Notes pursuant to the Offering Memorandum, Prospectus Supplement and the other Offering Documents. At the time Plaintiff purchased the Class A Notes, Plaintiff did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

59.    Plaintiff was damaged by the Defendants' wrongful conduct.    Plaintiff has retained the Class A Notes and has the right to rescind and recover the current balance of $5,478,945 of the Class A Notes, as set forth in Section 12(a)(2) of the Securities Act. Plaintiff hereby tenders the Class A Notes to Defendants in exchange for the current balance of $5,478,945 for such Class A Notes, plus interest.

60.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Memorandum, the Prospectus Supplement and the other Offering Documents and within three years of when the Class A Notes were sold to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of Section 15 of the Securities Act
(Against HSBC Bank)

61.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

62.     This Cause of Action is brought against Defendant HSBC BANK as a controlling person pursuant to Section 15 of the Securities Act of 1933.  HSBC BANK, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Defendants within the meaning of Section 15 of the Securities Act.  HSBC BANK had the power and influence, and exercised that power and influence, to cause the Defendants to engage in violations of the Securities Act, as described herein.

63.     HSBC BANK's control ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff.

64.     By virtue of the wrongful conduct alleged herein, HSBC BANK is liable to Plaintiff for Plaintiff's sustained damages.

### RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Awarding rescissionary damages in favor of Plaintiff and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in the amount of $5,478,945, including interest thereon;

(b)     Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)     Such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: May _28_ , 2009.

MADDOX HARGETT & CARUSO, P.C.

By: _____

Steven B. Caruso, Esq.
New York Bar No. 1701598
Maddox Hargett & Caruso, P.C.
80 Broad Street, Fifth Floor
New York, NY 10004
Email: sbcaruso@aol.com
Telephone: (212) 837-7908
Facsimile: (212) 837-7998

{214490.0021/N0764931_1}

## The Mortgage Loans (All Collateral)

### Distribution by Original Combined Loan-to-Value Ratios

| Range of Original Combined Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Statistical Cut-off Date Principal Balance ($) | % of Mortgage Pool by Aggregate Statistical Cut-off Date Principal Balance | Average Statistical Cut-off Date Principal Balance ($) | Weighted Average Gross Interest Rate (%) | Weighted Average Original Loan-to-Value (%) | Weighted Average Original Combined Loan-to-Value (%) | Weighted Average Credit Score | Weighted Average Debt Ratio (%) |
|---|---|---|---|---|---|---|---|---|---|
| Less than or equal to 30.00 | 21 | 2,196,344 | 0.13 | 104,550 | 6,743 | 25.97 | 25.97 | 678 | 38.70 |
| 30.01 – 35.00 | 13 | 1,199,547 | 0.07 | 91,811 | 6,879 | 32.22 | 32.22 | 647 | 31.59 |
| 35.01 – 40.00 | 24 | 3,787,686 | 0.22 | 157,820 | 6,377 | 37.58 | 37.58 | 693 | 38.07 |
| 40.01 – 45.00 | 38 | 5,747,972 | 0.33 | 151,262 | 6,624 | 43.07 | 43.07 | 678 | 39.05 |
| 45.01 – 50.00 | 62 | 10,296,843 | 0.60 | 166,078 | 7,165 | 47.64 | 47.64 | 655 | 38.78 |
| 50.01 – 55.00 | 69 | 11,731,081 | 0.68 | 170,016 | 7,075 | 52.58 | 52.58 | 647 | 40.43 |
| 55.01 – 60.00 | 106 | 20,352,260 | 1.18 | 186,723 | 7,257 | 57.85 | 57.85 | 632 | 36.81 |
| 60.01 – 65.00 | 140 | 25,607,295 | 1.49 | 182,909 | 7,523 | 63.20 | 63.20 | 638 | 40.85 |
| 65.01 – 70.00 | 209 | 42,811,331 | 2.49 | 204,839 | 7,341 | 68.48 | 68.48 | 642 | 39.10 |
| 70.01 – 75.00 | 269 | 55,167,259 | 3.21 | 221,555 | 7,390 | 73.56 | 73.33 | 637 | 40.78 |
| 75.01 – 80.00 | 922 | 184,436,028 | 10.72 | 200,039 | 7,588 | 79.35 | 79.35 | 637 | 41.13 |
| 80.01 – 85.00 | 424 | 76,139,658 | 4.43 | 179,574 | 8,363 | 83.83 | 84.51 | 615 | 42.27 |
| 85.01 – 90.00 | 749 | 144,484,783 | 8.40 | 192,904 | 8,436 | 87.43 | 89.64 | 634 | 41.54 |
| 90.01 – 95.00 | 641 | 123,636,481 | 7.19 | 192,879 | 8,674 | 89.77 | 94.70 | 660 | 42.09 |
| 95.01 – 100.00 | 5,633 | 1,009,902,764 | 58.70 | 179,287 | 7,540 | 83.97 | 99.96 | 661 | 44.13 |
| Greater than or equal to 100.01 | 16 | 2,963,383 | 0.17 | 185,586 | 8,474 | 102.31 | 102.87 | 696 | 45.29 |
| Total: | 9,319 | 1,720,558,697 | 100.00 | 184,627 | 7,591 | 82.09 | 92.05 | 653 | 42.90 |

Weighted Average Original Combined Loan-to-Value Ratios (%): 92.05
Minimum Original Combined Loan-to-Value Ratios (%): 9.58
Maximum Original Combined Loan-to-Value Ratios (%): 103.00
Standard Deviation (%): 12.75

A-8

EXHIBIT
A

## Class A Notes

| Percentage of Prepayment Assumption | Percentage of Default Assumption | | | | | |
|---|---|---|---|---|---|---|
| | 75% | 100% | 125% | 150% | 175% | 200% |
| **70%** | | | | | | |
| WAL (years): | 0.69 | 0.70 | 0.71 | 0.73 | 0.75 | 0.77 |
| Principal Window (months): | 1 – 20 | 1 – 20 | 1 – 21 | 1 – 22 | 1 – 23 | 1 – 24 |
| Collateral Cum. Loss Pct.: | 2.48% | 3.31% | 4.14% | 4.96% | 5.79% | 6.62% |
| **85%** | | | | | | |
| WAL (years): | 0.67 | 0.68 | 0.69 | 0.71 | 0.73 | 0.75 |
| Principal Window (months): | 1 – 19 | 1 – 20 | 1 – 21 | 1 – 22 | 1 – 23 | 1 – 24 |
| Collateral Cum. Loss Pct.: | 2.48% | 3.31% | 4.14% | 4.96% | 5.79% | 6.62% |
| **100%** | | | | | | |
| WAL (years): | 0.65 | 0.66 | 0.67 | 0.69 | 0.70 | 0.73 |
| Principal Window (months): | 1 – 19 | 1 – 20 | 1 – 20 | 1 – 22 | 1 – 23 | 1 – 24 |
| Collateral Cum. Loss Pct.: | 2.48% | 3.31% | 4.14% | 4.96% | 5.70% | 6.62% |
| **115%** | | | | | | |
| WAL (years): | 0.64 | 0.64 | 0.65 | 0.67 | 0.68 | 0.70 |
| Principal Window (months): | 1 – 19 | 1 – 19 | 1 – 20 | 1 – 21 | 1 – 22 | 1 – 24 |
| Collateral Cum. Loss Pct.: | 2.48% | 3.31% | 4.14% | 4.96% | 5.79% | 6.62% |
| **130%** | | | | | | |
| WAL (years): | 0.62 | 0.63 | 0.64 | 0.65 | 0.66 | 0.68 |
| Principal Window (months): | 1 – 18 | 1 – 19 | 1 – 20 | 1 – 21 | 1 – 22 | 1 – 24 |
| Collateral Cum. Loss Pct.: | 2.48% | 3.31% | 4.14% | 4.96% | 5.77% | 6.56% |
| **150%** | | | | | | |
| WAL (years): | 0.60 | 0.61 | 0.61 | 0.62 | 0.63 | 0.65 |
| Principal Window (months): | 1 – 18 | 1 – 18 | 1 – 19 | 1 – 20 | 1 – 21 | 1 – 23 |
| Collateral Cum. Loss Pct.: | 2.48% | 3.30% | 4.11% | 4.89% | 5.64% | 6.36% |



EXHIBIT
B

HASCO NIM Trust
Net Interest Margin Notes
Distribution Date: 28-Apr-2009

HASCO NIM Trust
Net Interest Margin Notes
Series 2006-FF9

Contact: Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
9480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:  1-866-846-4526
Fax:  240-586-8675

## Delinquency Status

| DELINQUENT | No. of Loans | Principal Balance | BANKRUPTCY | No. of Loans | Principal Balance | FORECLOSURE | No. of Loans | Principal Balance | REO | No. of Loans | Principal Balance | Total | No. of Loans | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Days | 309 | 49,735,894.13 | 0-29 Days | 37 | 4,722,802.13 | 0-29 Days | 0 | 0.00 | 0-29 Days | 0 | 0.00 | 0-29 Days | 37 | 4,722,802.13 |
| 60 Days | 136 | 25,640,746.07 | 30 Days | 8 | 921,284.23 | 30 Days | 0 | 0.00 | 30 Days | 0 | 0.00 | 30 Days | 317 | 50,657,177.36 |
| 90 Days | 43 | 8,248,403.48 | 60 Days | 10 | 2,061,180.17 | 60 Days | 1 | 44,345.81 | 60 Days | 0 | 0.00 | 60 Days | 147 | 27,555,272.05 |
| 120 Days | 35 | 5,307,237.42 | 90 Days | 10 | 1,663,257.31 | 90 Days | 78 | 14,952,912.40 | 90 Days | 0 | 0.00 | 90 Days | 136 | 24,864,578.11 |
| 150 Days | 24 | 4,355,753.16 | 120 Days | 12 | 2,139,964.85 | 120 Days | 99 | 20,357,699.50 | 120 Days | 146 | 0.00 | 120 Days | 146 | 23,804,901.77 |
| 180+ Days | 130 | 11,404,505.07 | 150 Days | 20 | 1,816,210.09 | 150 Days | 80 | 19,829,712.34 | 150 Days | 8 | 1,079,125.95 | 150 Days | 132 | 27,530,801.56 |
| Totals | 687 | 124,592,544.25 | 180+ Days | 80 | 16,645,767.76 | 180+ Days | 455 | 103,731,783.61 | 180+ Days | 407 | 26,235,201.20 | 180+ Days | 1,072 | 237,687,257.64 |
|  |  |  | Totals | 177 | 29,847,466.54 | Totals | 713 | 159,968,453.63 | Totals | 415 | 87,314,327.15 | Totals | 1,987 | 400,822,791.62 |
| 30 Days | 6.2411639% | 5.7804585% | 0-29 Days | 0.0473245% | 0.5411025% | 0-29 Days | 0.0000000% | 0.0000000% | 0-29 Days | 0.0000000% | 0.0000000% | 0-29 Days | 0.7447324% | 0.5413025% |
| 60 Days | 2.7466120% | 2.9158810% | 30 Days | 0.1645834% | 0.1055933% | 30 Days | 0.0000000% | 0.0000000% | 30 Days | 0.0000000% | 0.0000000% | 30 Days | 6.4027474% | 5.8005519% |
| 90 Days | 0.8695914% | 0.9453836% | 60 Days | 0.2019779% | 0.2370447% | 60 Days | 0.0201986% | 0.0051284% | 60 Days | 0.0000000% | 0.0000000% | 60 Days | 2.9590979% | 3.1582369% |
| 120 Days | 0.7069242% | 0.6083197% | 90 Days | 0.2019779% | 0.1906346% | 90 Days | 1.5754395% | 1.7118226% | 90 Days | 0.0000000% | 0.0000000% | 90 Days | 2.7469930% | 2.8498439% |
| 150 Days | 0.4847351% | 0.5490799% | 120 Days | 0.2423775% | 0.2452713% | 120 Days | 1.9995996% | 2.3312899% | 120 Days | 0.0000000% | 0.0000000% | 120 Days | 2.9438999% | 3.1186417% |
| 180+ Days | 2.6257329% | 3.5690809% | 150 Days | 0.4039699% | 0.2081664% | 150 Days | 1.6158135% | 2.2785035% | 150 Days | 0.1615484% | 0.1236649% | 150 Days | 2.6661283% | 3.1554319% |
| Totals | 13.7749595% | 14.2381231% | 180+ Days | 1.6158135% | 1.9044897% | 180+ Days | 9.1906639% | 11.8891146% | 180+ Days | 8.2205629% | 9.8388116% | 180+ Days | 21.6521919% | 27.2462423% |
|  |  |  | Totals | 3.5730855% | 3.4326167% | Totals | 14.4011313% | 18.2010161% | Totals | 8.3621457% | 10.1333036% | Totals | 45.5401333% |  |

## ADMINISTRATION FEES

Certificate Administration Fee:     0.00

EXHIBIT
C